United States District Court
Southern District of Texas

**ENTERED**

February 14, 2017

David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| REBECCA ELIZABETH THOMPSON, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:16-cv-00553 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| ACTING COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial

management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #3). Cross-motions for

summary judgment have been filed by Plaintiff Rebecca Thompson ("Plaintiff," "Thompson") and

by Defendant Carolyn W. Colvin ("Defendant," "Commissioner"), in her capacity as Acting

Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary

Judgment ["Plaintiff's Motion"], Docket Entry #10; Defendant's Motion for Summary Judgment,

Memorandum in Support of Defendant's Cross Motion for Summary Judgment ["Defendant's

Motion"], Docket Entries #8, 9). Each party has also filed a response to the competing motions.

(Plaintiff's Response, Docket Entry #11; Defendant's Response to Plaintiff's Cross-Motion for

Summary Judgment ["Defendant's Response"], Docket Entry #12). After considering the pleadings,

the evidence submitted, and the applicable law, the court **RECOMMENDS** that Defendant's Cross

Motion for Summary Judgment be **GRANTED**, and that Plaintiff's Motion be **DENIED**.

**Background**

On March 22, 2013, Rebecca Thompson filed an application for Social Security Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"). (Transcript ["Tr."]

at 11, 128-29). In her application, Thompson claimed that she had been unable to work since April 13, 2012, due to "fibromyalgia,[1] rheumatoid arthritis, and a sleep disorder." (Tr. at 11, 59). The SSA denied Thompson's application on July 31, 2013, finding that she was not disabled under the Act. (Tr. at 67, 81-84). On August 9, 2013, Thompson petitioned for a reconsideration of that decision. (Tr. at 85). The SSA then had her case independently reviewed, but again denied her benefits, on November 1, 2013. (Tr. at 77, 86-89).

On November 20, 2013, Thompson successfully requested a hearing before an administrative law judge ["ALJ"]. (Tr. at 90). That hearing, before ALJ Gerald Meyer, took place on June 9, 2014. (Tr. at 11, 18). Thompson appeared with her attorney, William Herren ["Mr. Herren"], and she testified in her own behalf. (Tr. at 44-58). The ALJ also heard testimony from Vickie Colenburg ["Ms. Colenburg"], a vocational expert witness. (*Id.*). No medical experts testified at the hearing.

Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1. An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings. 20 C.F.R. §§ 404.1520(b) and 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors. 20 C.F.R. §§ 404.1520(d) and 416.920(d).

---

[1]"Fibromyalgia" is a form of "nonarticular rheumatism characterized by musculoskeletal pain, spasm and stiffness, fatigue, and severe sleep disturbance. Common sites of pain or stiffness can be [] in the lower back, neck, shoulder region, arms, hands, knees, hips, thighs, legs, and feet." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY, 632 (5th ed. 1998).

4.      If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

5.      If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). It is well-settled, under this analysis, that Thompson has the burden to prove any disability that is relevant to the first four steps. *See Wren*, 925 F.2d at 125. If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy. *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125. "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)). An individual claiming disability insurance benefits under the Act has the burden to prove that she suffers from a disability. *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). Under the Act, a claimant is deemed disabled only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C.

§ 423(d)(1)(A)). Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452. A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "[she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ determined that Thompson suffers from fibromyalgia, migraine headaches, obesity, and insomnia, and that those impairments are "severe." (Tr. at 13). He found, however, that none of those impairments met, or equaled in severity, the medical criteria for any disabling impairment in the applicable SSA regulations. (Tr. at 14). The ALJ then assessed Thompson's residual functional capacity (RFC), and concluded that she is capable of performing "light work,"[2] with the following limitations:

> Lifting or carrying [items weighing] up to 20 pounds occasionally and [items weighing up to] 10 pounds frequently; standing and/or walking for up to 6 hours in an 8-hour workday with normal [] breaks; and sitting for up to 6 hours in an 8-hour workday with normal [] breaks. . . frequently, but not constantly perform fine fingering and gross handling with her bilateral upper extremities. [No] [] working in

---

[2]"Light work" involves occasionally lifting items weighing no more than twenty pounds, with frequent lifting or carrying items weighing up to ten pounds. Although the weight lifted may be very little, a job is designated as "light" if it requires a good deal of walking or standing, or if it involves sitting a majority of the time, with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, an individual must be able to perform substantially all of the activities listed. An individual must also be capable of performing sedentary work, unless there are additional limiting factors. 20 C.F.R. §§404.1567(a),(b).

extreme heat or cold, [] at unprotected heights[,] or around dangerous moving machinery[,] and no climbing ropes, ladders[,] or scaffolds.

(Tr. at 14). Next, the ALJ found that Thompson is capable of performing her past relevant work as an administrative assistant. (Tr. at 18). For that reason, he concluded that Thompson "has not been under a 'disability,' as defined in the Social Security Act, from April 13, 2012 through the date of []his decision[,]" and he denied her application for disability benefits. (*Id*.).

On December 16, 2014, Thompson requested an Appeals Council review of the ALJ's decision. (Tr. at 42-43). SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present: "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest." 20 C.F.R. §§ 404.970 and 416.1470. On December 23, 2015, the Appeals Council denied Thompson's request, finding that no applicable reason for review existed. (Tr. at 1-7). With that ruling, the ALJ's findings became final. *See* 20 C.F.R. §§ 404.984(b)(2) & 416.1484(b)(2).

On March 1, 2016, Thompson filed this lawsuit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge the decision of the SSA. (Plaintiff's Original Complaint to Review Decision of Commissioner of Social Security ["Complaint"], Docket Entry #1). Subsequently, the parties filed cross-motions for summary judgment. Having considered the pleadings, the evidence submitted, and the applicable law, it is recommended that Defendant's cross-motion for summary judgment be granted, and that Plaintiff's motion for summary judgment be denied.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied. *See Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id.* (citing *Martinez*, 64 F.3d at 173). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)). On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). In making this determination, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Thompson's own testimony about her pain; and Thompson's educational background, work history, and present age. *See Wren*, 925 F.2d at 126. If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper. *See Johnson*, 864 F.2d at 343.

**Discussion**

Before this court, Plaintiff contends that the ALJ erred in his determination that she is not disabled. (Plaintiff's Motion at 5). Plaintiff alleges, specifically, that the ALJ failed to examine all of the evidence in the record. (*Id.* at 5-11). In support of that allegation, she claims, first, that the

ALJ did not consider evidence of her "profound [d]epression[.]" (*Id*. at 6). Next, she argues that the ALJ failed to incorporate the functional limitations set out by Dr. William Culver, an examining physician, in his RFC assessment. (*Id*. at 11-13). Plaintiff also contends that the Appeals Council ignored "new and material evidence" submitted by Dr. Robert Harper, another examining physician, which shows that she suffers from disabling depression. (*See id*. at 13-17). Plaintiff insists that, had the ALJ considered all of the evidence, he would have reached a different result. (*Id*. at 18). Defendant maintains, however, that the ALJ properly considered all of the available evidence, and followed the applicable law, in determining that Thompson is not disabled. (Defendant's Motion at 3-5; Defendant's Reply at 1-4).

### *Medical Facts, Opinions, and Diagnoses*

The earliest medical records show that Plaintiff was treated by Dr. Lance Feray ["Dr. Feray"], a family medicine physician, on February 1, 2010. (Tr. at 215-16). On that date, she complained of recurring migraine headaches which had recently increased in frequency and intensity. (Tr. at 215). She stated that Fioricet had been prescribed to treat her pain, but that it had not alleviated it. (Tr. at 215). Thompson was not able to identify any significant triggers for her headaches, and Dr. Feray did not observe any neurological abnormalities. However, he did observe that her blood pressure was elevated. (*Id*.). He prescribed Inderal, Apidex, and Fioricet, and instructed her to return for another appointment in three weeks. (Tr. at 215, 216).

Thompson returned to see Dr. Feray the following year, on May 18, 2011. She told him that she had been suffering from a migraine for the past month. (Tr. at 217). She complained of pain in her neck and forehead, as well as nausea, and occasional sensitivity to light. (*Id*.). She reported that she often had a headache on rising, and that, sometimes, pain awakened her. (*See id*.). She said that

Hydrocodone eased her pain, so Dr. Feray recommended that she continue taking a low dosage of that medication. (Tr. at 218). He also prescribed Apidex, Fioricet, Phenegran, Prednisone, and Skelaxin. (*Id.*). On May 23, 2011, Plaintiff said that her migraines had not improved. (Tr. at 219). She stated that pain radiated from the suboccipital region of her skull, across her face, and into her jaw. (*Id.*). Thompson also reported several neurological abnormalities, including tingling, unsteadiness, dizziness, and memory loss. Dr. Feray referred Plaintiff to a neurologist, and instructed her to continue taking Phenegran, Prednisone, Skelaxin, and Hydrocodone. (Tr. at 219, 220).

On May 24, 2011, Plaintiff was seen by Dr. Amy Naquin-Chappel ["Dr. Naquin-Chappel"], a neurologist at Modern Neurology of Northwest Houston, P.A. (Tr. at 223-25). Thompson informed Dr. Naquin-Chappel that she began suffering from migraine headaches five years ago, and that the headaches initially improved with Apidex and weight loss. (Tr. at 223). She said that the migraines returned in the fall of 2010. (*See id.*). She described her pain as sharp and fleeting in the left occipital region of her skull, and said that it was followed by constant pressure in the occipital and temporal regions of her skull and jaw. She also complained of sensitivity to light and sound, occasional nausea, blurry vision, and significant pain and tension in her neck. (Tr. at 223, 224). Dr. Naquin-Chappel observed that Plaintiff's neurological faculties were intact, and that she was fully alert and oriented. (Tr. at 224). The doctor did not report any motor skill or muscular deficits. (Tr. at 225). Dr. Naquin-Chappel diagnosed Thompson as likely suffering from tension headaches due to cervical neck disease. (*Id.*). She prescribed Neurontin, and referred Plaintiff to a radiologist for a brain and cervical magnetic resonance image (MRI). Dr. Naquin-Chappel also recommended that Thompson seek treatment from a physical therapist or chiropractor, and that she return in two weeks. (*Id.*).

An MRI of Thompson's cervical spine, dated May 24, 2011, revealed mild anterior disc

protrusion and spondylosis[3] at the C4-C5 levels. (Tr. at 221). It also showed mild disc narrowing, a diffuse disc bulge, and partial effacement of the anterior thecal sac, without canal stenosis, at the C5-C6 levels. (*Id.*). An MRI of Thompson's brain, also dated May 24, 2011, showed no acute intracranial processes. (Tr. at 222). The radiologist recommended additional imaging in one year to establish stability. (*Id.*).

Plaintiff returned to Dr. Naquin-Chappel on June 3, 2011, and reported that her headaches had improved. (Tr. at 226-28). Thompson stated that she had been taking Neurontin, as prescribed, Tizanidine, and a steroid pack. (Tr. at 226). She also said that she had sought treatment from a chiropractor and an acupuncture therapist. Plaintiff complained of persistent pain in the back of her skull, radiating to the front, but admitted that her headaches were much milder than before she began this course of treatment. (*Id.*). Dr. Naquin-Chappel ordered an electromyography[4] (EMG) test, which showed that Plaintiff had been suffering from mild right radiculopathy.[5] (Tr. at 228, 231, 233). Dr. Naquin-Chappel instructed Thompson to continue taking Neurontin, for pain and radiculopathy, Tizanidine, as prescribed, Vicodin, as needed, and to continue seeing a chiropractor. (Tr. at 228). She recommended that Plaintiff return in six weeks. (*Id.*).

On July 15, 2011, Thompson went back to Dr. Naquin-Chappel, complaining that her headaches had returned. (Tr. at 236-38). Plaintiff said that her pain was localized at the base of her skull, and that it radiated to her temples. (Tr. at 236). She described the pain as sharp and throbbing. However, she conceded that the tension in her neck had diminished with chiropractic visits and

---

[3]"Spondylosis" is a condition of the spine characterized by fixation or stiffness of a vertebral joint. MOSBY'S at 1528.

[4]An "electromyography" is the process of electrically recording muscle action potentials. MOSBY'S at 545.

[5]"Radiculopathy" is a disease involving a spinal nerve root. MOSBY'S at 1377.

Neurontin. She also spoke of a constant "achy sensation" in all of her extremities, that did not respond to Neurontin. (*Id*.).  Plaintiff stated that she had been experiencing fatigue, chest pain, and muscle spasms, however, no abnormalities were observed during the examination. (Tr. at 237, 238). Dr. Naquin-Chappel ordered Plaintiff to continue taking Neurontin and Tizanidine, and to continue seeing a chiropractor. She also prescribed Cymbalta, and referred Thompson to a rheumatologist to assess her widespread aches and pains. (Tr. at 238).

    On July 16, 2011, Thompson again saw Dr. Feray. She recalled that she had been suffering from body pain since May, 2011. (Tr. at 234). She said that she had been feeling "off-kilter[,]" and that she constantly felt dizzy. (*Id*.). Plaintiff admitted, however, that she had stopped taking Neurontin. (*Id*.). Dr. Feray prescribed Cymbalta, ordered a metabolic panel, and instructed Plaintiff to return in two weeks. (Tr. at 235).

    On July 27, 2011, Plaintiff received follow-up treatment from Dr. Feray.  (Tr. at 206). She complained of allergies and a mild upper respiratory infection. She also complained that her recurring body aches and insomnia had worsened recently. (Tr. at 203, 206). In addition, Plaintiff reported headaches; nausea; muscle, joint and back pain; and muscle weakness. (Tr. at 205). She stated that she had been coping well with her symptoms, but that she was constantly fatigued. (*Id*.). After reviewing Thompson's metabolic panel, Dr. Feray reported that she had a positive rheumatoid arthritis factor and slightly elevated cholesterol levels. (Tr. at 240). He referred Plaintiff to a rheumatologist for further evaluation of her medications, fibromyalgia, and possible rheumatoid arthritis. (*Id*.).

    On August 3, 2011, Plaintiff sought treatment from Dr. Tonya Cockrill ["Dr. Cockrill"], a rheumatologist at the Woodlands Arthritis Clinic. (Tr. at 241-42). Thompson complained of severe

neck pain with radicular symptoms. (Tr. at 242). Dr. Cockrill reported that Plaintiff showed multiple myofascial tender points, but exhibited no synovitis.[6] (*Id*.). Dr. Cockrill explained that, although myofacial tenderness can be caused by fibromyalgia, she believed that Thompson's symptoms were caused by radiculopathy. (*Id*.). She found no evidence of active rheumatoid arthritis. Dr. Cockrill increased Plaintiff's Cymbalta dosage, and encouraged her to see a pain management specialist for intraarticular injections. She also instructed Thompson to return for a follow-up appointment in four to six weeks. (*Id*.).

On August 17, 2011, Plaintiff met with Dr. Thomas Cartwright ["Dr. Cartwright"], an orthopedic surgeon at KSF Orthopedic Center. (Tr. at 243-46). Thompson reported that she had been suffering from neck pain for approximately five months. (Tr. at 243). She described the pain as primarily "dull and achy," but said that it can be "sharp, burning, tingling, and shooting." (*Id*.). She also complained of weakness in her arms with numbness, tingling, and cramping that radiated to her hands. (Tr. at 243, 244).  Plaintiff reported fever, chills, fatigue, blurry vision, chest pain, and nausea, but she denied experiencing any sleep problems, depression, or anxiety. (Tr. at 244). Dr. Cartwright reviewed the cervical MRI taken on May 24, 2011, and determined that the "mild bulging disc at C5/6 [was] an unlikely source of her [] body [aches]." (Tr. at 245). Nevertheless, Dr. Cartwright advised Plaintiff to complete exercises to stabilize the disc and to reduce inflammation in the area. He also discussed the possibility of surgical treatment to further stabilize the joint. (Tr. at 246). Ultimately, Dr. Cartwright wrote Thompson a prescription for physical therapy, and gave her a steroid injection at the site of the symptomatic disc. (Tr. at 245).

---

[6]"Synovitis" is an inflammatory condition of the synovial membrane of a joint as the result of an aseptic would or a traumatic injury, such as a sprain or severe strain. MOSBY'S at 1579.

On October 7, 2011, Thompson was again seen by Dr. Feray. (Tr. at 247-48). She continued to complain of migraine headaches. (Tr. at 247). Plaintiff reported that she had not had any side effects from her medications, and she complained of only mild fatigue. She asked Dr. Feray to increase her Cymbalta dosage, and he did so. (Tr. at 247, 248). Plaintiff returned on January 10, 2012, complaining of pain, radiating down both of her arms, and a tremor. (Tr. at 249-50). She said that the tremor began in late August. She explained that she had difficulty in holding items, and that the pain traveled from her shoulder to her elbow. (Tr. at 249). Thompson also reported experiencing intermittent hot flashes. (Tr. at 250). Dr. Feray reported that the tremor might be "low grade seizure activity," so he ordered a metabolic panel, and he instructed Thompson to return to Dr. Naquin-Chappel for further neurological evaluation. (*Id*.).

On January 18, 2012, Plaintiff again met with Dr. Naquin-Chappel. (Tr. at 254-56). She repeated her complaints of severe headaches and extremity pain, despite medication. (Tr. at 254). She also told Dr. Naquin-Chappel that she had been having hot flashes, memory and concentration problems, twitching in her extremities, chills, chest pain, muscle cramps, and some blurry vision. (Tr. at 254, 255). She denied any serious disruptions with executive functions. (Tr. at 254). Dr. Naquin-Chappel determined that Plaintiff was likely suffering from fibromyalgia. (Tr. at 256). She discontinued the Neurontin, prescribed Lyrica, and ordered autoimmune blood tests. She also instructed Thompson to continue seeing a chiropractor, and to return for another appointment in two to three weeks. (*Id*.).

Plaintiff saw Dr. Feray again on April 4, 2012. (Tr. at 257-58). Thompson reported that she had been tolerating her medications well, and that she had not had any significant problems. (Tr. at 257). She denied any chest pain, anxiety, or unusual fatigue. (*Id*.).

12

On April 16, 2012, Dr. Qaiser Rehman ["Dr. Rehman"], a rheumatologist acting on behalf of the state, conducted a physical status exam on Thompson. (Tr. at 259-60). Plaintiff told Dr. Rehman that she had not been able to work for the past week due to apprehension, nervousness, jitteriness, and fidgetiness. (Tr. at 259). She reported symptoms of fibromyalgia, such as generalized pain, hyperalgesia,[7] chronic fatigue, and non-restorative sleep. She also complained of intermittent headaches. She denied any fever, chills, or weight loss. (*Id.*). She said that her current medications included Tramadol, Cymbalta, Phentermine, Lyrica, Medrol, Promethazine, Tizanidine, Fioricet, and Vicodin. (*Id.*). Dr. Rehman reported that Thompson appeared anxious, but observed that she was not in any obvious distress. He found fourteen tender points, but no indication of synovitis. (Tr. at 260). He concluded that she was positive for hyperflexia.[8] Dr. Rehman ultimately determined that Plaintiff was suffering from fibromyalgia and a mild case of serotonin syndrome.[9] (*Id.*). He advised against combining a high dose of Tramodol with Fioricet and Cymbalta. He instructed her to taper off of the Cymbalta, and to reduce her Tramodol dosage significantly. Dr. Rehman also recommended that she discontinue the Vicodin, and to try to manage her pain with nonpharmacological therapy. He then referred her to a psychiatrist for a cognitive behavioral therapy evaluation. (*Id.*).

On June 12, 2012, Plaintiff had another appointment with Dr. Feray. (Tr. at 261–62). She stated that her body aches and fatigue had not improved. (Tr. at 261). She also complained of pain in her shoulder blades, which radiated to her elbows, forearms, back, and hips, as well as insomnia

---

[7]"Hyperalgesia" is extreme sensitivity to pain. MOSBY'S at 787.

[8]"Hyperflexia" is the forcible overflexion or bending of a limb. *Id.* at 790.

[9]"Serotonin syndrome" occurs when an individual takes medications that cause high levels of the chemical serotonin to accumulate in his or her body. It can occur when an individual increases the dose of such a drug or adds a new drug to his or her regimen. Mayo Clinic, *Serotonin Syndrome* http://www.mayoclinic.org/diseases-conditions/serotonin-syndrome/home/ovc-20305669.

and nightmares. (*Id.*). Dr. Feray increased Plaintiff's Lyrica dosage, but did not alter her other medications. (Tr. at 262). On July 14, 2012, Thompson told Dr. Feray that she was unable to take a shower due to her body aches, and that Vicodin was no longer alleviating her pain. (*See* Tr. at 263). Plaintiff added that she had not been breathing normally during her sleep. (*Id.*). Dr. Feray stated that she was suffering from athralgia, myalgia, and anxiety. On July 16, 2011, Thompson reported burning pain and cramping in her legs, hips, thighs and calves. (Tr. at 265). In addition, she complained of frequent episodes of disrupted breathing during the night, nightmares, and fatigue. (*Id.*). Plaintiff added that, recently, she had been having panic attacks. (Tr. at 266). Dr. Feray ordered a sleep study to evaluate Thompson for possible sleep apnea,[10] and instructed her to return in two weeks. (*Id.*).

Plaintiff went to OakBend Medical Center on August 14, 2012 for a sleep study. (Tr. at 267–73). She reported a history of restlessness, disturbed sleep, episodes of waking with sudden gasping, dry mouth, arm and leg jerks or kicks, nightmares, and headaches. (Tr. at 267). The sleep study revealed no evidence of "sleep disordered breathing" or "limb movement disorder." (Tr. at 274). However, Plaintiff exhibited a "disrupted sleep architecture," due to increased arousals, and she showed no signs of significant REM cycle sleep. Ultimately, she was diagnosed with an unspecified physiological insomnia. (*Id.*).

Plaintiff returned to Dr. Feray on September 25, 2012, complaining of headaches in the suboccipital region of the skull, as well as bilateral hand, shoulder, and neck pain. (Tr. at 280). She

---

[10]"Sleep apnea" is a sleep disorder that occurs when a person's breathing is interrupted during sleep. The person is momentarily unable to move respiratory muscles or maintain airflow through the nose and mouth. MOSBY'S at 1503.

also said that she continued to experience restless sleep, but, she had not sought treatment from a sleep specialist. (*Id.*).

On October 4, 2012, Thompson had an appointment with Dr. David Brown ["Dr. Brown"], a sleep medicine physician at Sleep Diagnostics of Texas. (Tr. at 283-86). Plaintiff told Dr. Brown that she had no trouble sleeping before she was diagnosed with fibromyalgia. (Tr. at 283). She said that she goes to sleep between 8 p.m. and 9 p.m., but that she does not sleep soundly. She reported that she wakes up every hour, to adjust her body, due to her pain. (*Id.*). She admitted that she usually falls back to sleep within five minutes of waking. Thompson said that she gets up at 5 a.m. to prepare her children for school, but that she then returns to bed, and sleeps until approximately 9:30 a.m. (*Id.*). Dr. Brown reported that Plaintiff does not snore, or pause between breaths, during her sleep. (Tr. at 284). He also reported that she does not awaken with a sense that she is having difficulty breathing. Plaintiff told the doctor that she does wake up screaming, and that she attributes those episodes to nightmares, but, she does not remember having any dreams. (*Id.*). Thompson denied a history of depression, although, she said that her pain makes her feel "helpless and hopeless." (Tr. at 285). She added that she had been a "warrior" in the past, but that she no longer has that attitude. (*Id.*).

On October 25, 2012, Plaintiff had another appointment with Dr. Feray. (Tr. at 287). She informed him that she continued to struggle with severe fibromyalgia symptoms, and that her "depression ha[d] gotten a little bit worse." (Tr. at 287). Dr. Feray increased her Cymbalta dosage, and prescribed Ambien to treat her insomnia. (Tr. at 288). On December 19, 2012, Thompson again reported body aches, specifically in her wrists, hands, and thighs. (Tr. at 289). She also stated that

15

she had not been sleeping well. (*Id.*). Dr. Feray added Melatonin to her bedtime regimen to treat her insomnia, but she claimed that it was not effective. (Tr. at 290, 291).

On July 10, 2013, Dr. William Culver ["Dr. Culver"], a physiatrist,[11] acting on behalf of the state, examined Thompson. (Tr. at 209-14). Plaintiff told Dr. Culver that she had been diagnosed as suffering from fibromyalgia in May, 2011. (Tr. at 209). She reported experiencing generalized pain, which worsened with increased barometric pressure, changing weather, and caffeine. (*Id.*). She also complained of numbness, tingling, balance difficulties, headaches, muscle weakness, stiffness, cramping, and muscle spasms. (Tr. at 210). Thompson stated that, in 2012, she was diagnosed with rheumatoid arthritis. (Tr. at 209). She said that she experiences swelling in her hands and fingers, but admitted that she had not sought treatment for those symptoms. (*Id.*). Plaintiff then informed Dr. Culver that she suffers from insomnia, and that she "takes three sleeping pills [each] night[, but that she] does not sleep." (*Id.*). She added that her mood had been unstable. (Tr. at 210). Dr. Culver observed that Plaintiff's gait was normal, but that her movements were decreased, which suggested that she was in pain. (*Id.*). She was able to heel-toe walk, and to squat, without difficulty. (Tr. at 212). Dr. Culver observed that, in a neutral standing position, the curves of her spine were maintained, her extremities appeared normal, her shoulders were symmetric, and her pelvis was level. He also saw that Plaintiff had a full range of motion, as well as full extension and flexion, in her cervical, thoracic, and lumbar spine. (Tr. at 211-12). Her hips and knees also appeared to be non-tender, and she exhibited a normal range of motion. (Tr. at 213). However, during a musculoskeletal examination, Dr. Culver found eight pairs of tender points, which is a symptom of fibromyalgia. (Tr.

---

[11]A "physiatrist" is a physician specializing in physical medicine and rehabilitation who has been certified by the American Board of Physical Medicine and Rehabilitation after completing residency and other requirements. Mosby's at 1261.

at 211). He observed no arthritic changes or range of motion deficiencies in her upper extremities, and he found that her coordination appeared to be normal. (Tr. at 213). Dr. Culver diagnosed Plaintiff as suffering from "obesity, fibromyalgia, a history of rheumatoid arthritis, and a history of sleep dysfunction." (*Id.*). He concluded, ultimately, that Thompson would be unable to perform all of her daily activities. (Tr. at 214). He recommended that she avoid walking or standing for long periods, working in extreme temperatures, repetitively using her wrists and hands, climbing ladders or stairs, and lifting items which weighed more than twenty pounds.

On August 5, 2013, Thompson complained to Dr. Feray of worsening fibromyalgia symptoms. (Tr. at 293-94). She complained of severe body aches and joint pain, and that she had gained a "tremendous" amount of weight, due to the immobility caused by her condition. (Tr. at 293). She also had edema in her legs. Dr. Feray wrote that Plaintiff's fibromyalgia had "exceed[ed] the scope of [his] practice[,]" and that he had "no further ideas on how to diminish her pain." (Tr. at 294). He noted that she was no longer insured, so he recommended that she apply for Medicaid. He also recommended that she begin taking Cymbalta and Neurontin again, but she refused to do so. (*Id.*). On November 12, 2013, Plaintiff returned to Dr. Feray, and told him that her pain had not improved. (Tr. at 295). She stated that Skelexin, Hydrocodone, and Neurontin had not alleviated her pain, and that she could not afford pain management care. She also said that she had not been sleeping well, and that her legs continued to swell. (*Id.*). She returned on January 16, 2014, and reported that her condition had not improved. (Tr. at 297-98). On February 5, 2014, Thompson had another appointment with Dr. Feray, and told him that she had been "doing well on [her] med[ication]s[,]" but that Tizanidine provided some relief. (Tr. at 299). Dr. Feray ordered her to taper off of Mobic and Hydrocodone, but to, otherwise take her medication as prescribed. (Tr. at

300). On March 17, 2014, Plaintiff complained that her pain had worsened, because she had not been taking Mobic and Hydrocodone. (Tr. at 301). She stated that her anxiety level had risen, because of the pain. On April 16, 2014, Thompson reported fatigue, malaise, headaches, anxiety, and depression. (Tr. at 303). She added that her anxiety level had been higher than usual. (*Id.*). Dr. Feray increased her Klonopin dosage, and emphasized that she was to take the medication as prescribed. (Tr. at 304).

On January 5, 2015, Dr. Robert Harper ["Dr. Harper"], a psychiatrist at Menninger Department of Psychiatry and Behavioral Sciences at Baylor College of Medicine, performed a psychological evaluation of Plaintiff. (Tr. at 30-34). Thompson reported a loss of interest in activities, difficulty in maintaining concentration, anhedonia,[12] feelings of worthlessness, weight gain, and insomnia. (Tr. at 30). She denied pervasive sadness or suicidal ideation. (*Id.*). She said that she had stopped working due to migraines and numbness in her arms. She told Dr. Harper that her mother and children perform most of her daily activities, such as cooking and cleaning. (Tr. at 31). Dr. Harper recorded that her mood was subdued, but that she did not manifest any symptoms of severe depression. He wrote that her thought processes were "superficially logical and coherent," and that she was oriented to place and time. However, Dr. Harper noted that Plaintiff described relatively severe levels of depression and anxiety, and that she had marked manifestations of obsessive-compulsive worry and indecision. (Tr. at 32).He also observed significant somatic distress, including cardiovascular, nervous, and gastrointestinal symptoms. (*Id.*). He remarked that, although she appeared to be suffering from rather significant depressive symptoms, she had a

---

[12]"Anhedonia" is the inability to feel pleasure or happiness in response to experiences that are ordinarily pleasurable. It is often a characteristic of major depression. MOSBY'S at 93.

"strong propensity to deny [or] repress emotional distress." He added that this coping style made it likely that any emotional distress would aggravate Plaintiff's existing physical conditions. (*Id.*). Ultimately, he diagnosed Thompson as suffering from major depression, "masked," and assigned her a global assessment function (GAF) score of 45.[13] He concluded, however, that she is capable of managing funds on her own behalf. (*Id.*).

### Educational Background, Work History, and Age

At the time of the administrative hearing, Thompson was 42 years old. (Tr. at 13, 47). She testified that she had a high school education, and that her past relevant work included her job as an administrative assistant. (Tr. at 47). She stated that she had stopped working due to migraines and numbness in her arms. (Tr. at 31).

### Subjective Complaints

In her application for benefits, Thompson reported that she suffers from fibromyalgia, headaches, rheumatoid arthritis, chronic pain, a sleep disorder, and memory loss. (Tr. at 150). She stated that she does not sleep at night, because she is in constant pain, and that her joints are stiff in the morning. (*Id.*). She claims that she can walk only ten to twenty feet before she must stop and rest, and that she must rest for five to ten minutes before she can resume walking. (Tr. at 155). She reported that, some days, she is unable to feed or dress herself, due to her joint pain. Thompson

---

[13]The GAF scale is used to rate an individual's "overall psychological functioning." AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32 (4th ed. 1994). The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status. *See id.* It is important to note that the GAF scale was dropped from DSM-5 because of its "conceptual lack of clarity . . . and questionable psychometrics in routine practice." AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-5") 16 (5th ed. 2013).

claimed that she can no longer work or shop extensively, and that her children perform all of the house work. (Tr. at 151). She admitted that she shops for groceries once a month, and that she cleans for several minutes each day. (Tr. at 151, 152). She also conceded that she is able to make simple meals for herself, such as a sandwich or cereal, but that she no longer prepares large meals, because she cannot stand for extended periods. (Tr. at 152). She said that she goes outside once a week, but that she must be accompanied due to blackouts and confusion. (Tr. at 153). She also said that she no longer handles her finances, because she is easily confused and distracted. (Tr. at 153-54). Thompson reported that her activities include watching television and spending time with her children and mother. (Tr. at 154). She stated that she does not have difficulty following written instructions, but that she struggles to follow oral instructions. (Tr. at 155). Plaintiff also reported that she suffers from anxiety attacks, and that she "hears things at night[.]" (Tr. at 156, 157).

At the hearing, Thompson testified to the severity and debilitating effects of the impairments from which she suffers. (Tr. at 46-55). She stated that she was diagnosed with fibromyalgia in May, 2011. (Tr. at 48). She said that her symptoms include constant migraines, which begin in her head, and then radiate throughout her body. (*See* Tr. at 48-49). Plaintiff explained that, following her diagnosis, her headaches occurred more frequently, and her exhaustion worsened. (Tr. at 49). She reported that her exhaustion eventually became "unbearable." (Tr. at 50). She added that, at times, her feet swell, and that her hands "knot up[.]" (Tr. at 49-50).

Thompson also reported that she suffers from marginal rheumatoid arthritis. (Tr. at 49). She said that her joint pain worsens when the weather changes, and that some days, she is completely bedridden. (Tr. at 55). She did say that her joint pain has improved with anti-inflammatory medication and Hydrocodone. (Tr. at 53). However, she also reported that some of the medication

20

that she had been prescribed caused twitching, as well as nausea. (Tr. at 49-50).

Plaintiff testified that she also suffers from severe migraine headaches. (Tr. at 51-52). She reported that the headaches began before she was diagnosed with fibromyalgia. (Tr. at 51). Thompson stated that, when she has a migraine, she cannot tolerate light, sound, or smells. (Tr. at 51). She said that she suffers from these headaches weekly, and that the pain typically persists for an entire day before it subsides. She admitted, however, that her symptoms have improved with medication. (*Id.*).

Thompson told the ALJ that she also suffers from anxiety. She testified that she experiences violent panic attacks at night, and that she wakes up screaming. (Tr. at 54). She did say that her anxiety has been controlled with medication, and that she no longer suffers from frequent panic attacks. (*Id.*).

Plaintiff testified that her condition has affected her work attendance tremendously, and that she had not completed a 40-hour workweek since July, 2011. (Tr. at 50). She explained that she was granted short-term disability at her last job, because she had so many doctors' appointments. (Tr. at 52). However, she added that she was eventually terminated, because of poor attendance. (*Id.*).

### *Expert Testimony*

The ALJ also heard testimony from Ms. Vickie Colenburg, a vocational expert witness. (Tr. at 47, 56-57). She characterized Thompson's prior work experience, as an administrative assistant, as "light," in exertional level, and "skilled." (Tr. at 47). Following her summary, the ALJ posed a hypothetical question to Ms. Colenburg, to assess Thompson's residual functional capacity:

> Q    [A]ssume [] a person who could lift or carry [items weighing] about 10 pounds frequently or [items weighing] 20 pounds occasionally. Stand and walk up to 6 hours in an 8-hour day, with normal breaks or sit for 6. The following are never: Ropes, ladders or scaffolding, exposure to extreme heat

21

or extreme cold, unprotected heights or dangerous machinery. Handling or fingering with either arm is limited to frequently, but not continually. Could such an individual do the past work that you described?

A Yes, your honor.

(Tr. at 56-57). Thompson's attorney then cross-examined the vocational expert witness, asking the following question:

Q If you consider the last job and the testimony about [] missing work, missing as frequently as she did, how would that affect employment in general?

A More than likely [] that person wouldn't be able to maintain competitive employment.

(Tr. at 57).

### *The ALJ's Decision*

Following the hearing, the ALJ made written findings on the evidence. From his review of the record, he determined that Thompson suffered from fibromyalgia, migraine headaches, obesity, and insomnia, and that those impairments were "severe." (Tr. at 13). However, he concluded that Thompson did not have an impairment, or any combination of impairments, which met, or equaled in severity, the requirements of any applicable SSA Listing. (Tr. at 14). The ALJ then assessed Plaintiff's residual functional capacity, and concluded that she is capable of performing her past relevant work as an administrative assistant, as well as other "light work." (Tr. at 14, 18). Ultimately, he concluded that Thompson was not under a "disability," as defined by the Act, through the date of the decision, and he denied her application for disability insurance benefits. (Tr. at 18). That denial prompted her request for judicial review.

In this action, Plaintiff claims that the ALJ erred in determining that she "has not been under a disability. "(Plaintiff's Motion at 5). She argues, specifically, that the ALJ failed to examine all of the evidence in the record. (*Id*. at 5-11). On that point, she claims, first, that the ALJ did not consider evidence of her "profound [d]epression[.]"(*Id*. at 6). Next, she alleges that the ALJ failed

to incorporate the functional limitations set out by Dr. William Culver, an examining physician, into his RFC assessment. (*Id*. at 11-13). Plaintiff also contends that the Appeals Council ignored "new and material evidence" from Dr. Robert Harper, another examining physician, which shows that she suffers from disabling depression. (*Id*. at 13-17). Plaintiff insists that, had the ALJ considered all of the evidence, he would have reached a different result. (*Id*. at 18).

It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it. *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496). Any conflict in the evidence is to be resolved by the ALJ, and not the court. *See id*. A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision. *See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).

### *Depression*

Plaintiff contends that the ALJ erred by failing "to discuss[,] or even mention[, her] profound [d]epression[.]" (Plaintiff's Motion at 6). She alleges that her depression contributes significantly to her disability, and that the ALJ should have considered evidence of her mental impairment in evaluating her residual functional capacity. (*Id*. at 10). Defendant, however, argues that the ALJ had no obligation to consider evidence concerning Plaintiff's alleged depression, because Thompson did not allege "depression" as a disabling impairment. (Defendant's Response at 1-2). Defendant argues further that, even had Plaintiff claimed "depression" as an impairment, the record does not support a finding that depression prevented her from working. (*Id*. at 2).

In determining whether a disability exists, an ALJ "owe[s] a duty to a claimant to develop

23

the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citing *Kane v. Heckler*, 731 F.3d 1216, 1219) (5th Cir. 1984)). If he fails to do so, his decision is not supported by substantial evidence, and it is subject to reversal if the error results in prejudice to the claimant. *See Newton*, 209 F.3d at 456-57; *Ripley*, 67 F.3d at 557. The ALJ's duty to investigate, however, does not extend to potential impairments that are not alleged by the claimant, or to those disabilities that are not clearly indicated on the record. *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Deleon v. Colvin*, No. 7:14-CV-340, 2015 WL 12552003, at *14 (S.D. Tex. Sept. 22, 2015).

In this case, Thompson did not allege depression as a disabling condition in her application for benefits. (*See* Tr. at 128-29). Moreover, Plaintiff never mentioned depression, or allege any impact of depression on her ability to work, to any agency official during the application process. (*See* Tr. at 133-71). In fact, depression is mentioned only fleetingly in the Oakbend Medical Center's diagnostic report, and in one of Dr. Feray's treatment notes. (Tr. at 267, 287). Plaintiff also told Dr. Brown that her pain makes her feel "helpless and hopeless," but she denied a history of depression. (Tr. at 285). At the evidentiary hearing, held on June 9, 2014, neither Thompson nor her attorney made any claims about depression. (*See* Tr. at 44-858). Here, Plaintiff never raised the issue of a mental impairment, until this appeal, and there was insufficient evidence in the record to warrant an investigation into her mental and emotional health. For that reason, the ALJ had no duty to develop the possibility of Thompson's mental impairment. *Leggett*, 67 F.3d at 566 (holding that ALJ had no duty to develop evidence regarding claimant's mental impairment when record contained insufficient evidence of mental disability). On this point, the ALJ did not err.

### Dr. William Culver

Plaintiff also contends that the ALJ erred by failing to incorporate the limitations discussed in the opinion from the state's examining physiatrist, Dr. William Culver. (Plaintiff's Motion at 5-7). She claims, in particular, that Dr. Culver's findings that she has swelling in her hands and fingers, neurological abnormalities, headaches, and muscular deficits; that she cannot walk or stand for long periods; and that she should avoid the repetitive use of her wrists and hands, contradict the ALJ's residual functional capacity assessment. (*Id*. at 11-13). She insists that the ALJ improperly substituted his own opinion for that from Dr. Culver, and that he ignored those findings that support a determination of disability. (*See id.* at 13).

It is well settled that all medical opinions are to be considered in determining the disability status of a claimant. 20 C.F.R. §§ 404.1527(b), 416.927(b). However, it is also undisputed that the ALJ has "sole responsibility for determining a claimant's disability status." *Newton*, 209 F.3d at 455 (*quoting Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)). In making that determination, an ALJ will evaluate medical source opinions that discuss the nature and severity of a claimant's impairment. 20 C.F.R. § 404.1527(c)(2). In evaluating the opinion of a nontreating physician, an ALJ is free to incorporate only those limitations that he finds "consistent with the weight of the evidence as a whole." *Andrews v. Astrue,* 917 F.Supp2d 624, 642 (N.D. Tex. 2013) (quoting *Hernandez v. Astrue*, 278 Fed.Appx.333, 338 (5th Cir. 2008) (per curiam)). "[A]lthough the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician" when he has good cause to do so. *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) (quoting *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981)).

In this case, the ALJ appropriately considered the opinion from Dr. Culver regarding Plaintiff's activity and limitations. The ALJ discussed Dr. Culver's observations and his diagnostic impressions in detail. (Tr. at 16-17). He also expressly addressed Dr. Culver's opinion regarding Plaintiff's capacity for activity and mobility. (Tr. at 17). He stated explicitly that he gave "great weight" to Dr. Culver's opinion, because it "adequately evaluate[d] [Plaintiff's] overall physical functioning." (*Id*.). Indeed, it is clear that the ALJ considered, and subsequently incorporated, those particular findings  into the RFC assessment, that he determined to be "consistent with the weight of the evidence as a whole." *Andrews,* 917 F.Supp.2d at 642. In fact, in his written opinion, the ALJ made specific reference to Dr. Culver's observation that Plaintiff's movements were "decreased [] with generalized discomfort, but [that] her gait was normal[,]" and that she was able to "get on and off the exam table."  (Tr. at 16). The ALJ also referenced Dr. Culver's finding that Thompson had eight pairs of tender points throughout her body, but that she maintained a normal range of motion in her spine. (*Id*.). In addition, the ALJ cited Dr. Culver's observation that Plaintiff's cranial nerve examination was normal, and that she exhibited no signs of motor or sensory deficits. (*Id*.).

Dr. Culver ultimately diagnosed Thompson as suffering from obesity, fibromyalgia, a history of rheumatoid arthritis, and a history of sleep dysfunction. (Tr. at 17, 213). He then found that Thompson would be unable to perform all of her daily activities, and he recommended that she avoid lifting any items weighing more than twenty pounds, standing or walking for long periods, working in extreme temperatures, or participating in activities that require repetitive use of her wrists or hands. (Tr. at 17, 214). These conclusions are medical opinions that must be considered in the ALJ's determination of whether a claimant is disabled under the Act. 20 C.F.R. §§ 404.1527(b)*,* 404.1527(c)(2)*.* Dr. Culver's recommendations regarding Thompson's daily activities include his

impression of her capacity for physical and occupational functioning. The ALJ took Dr. Culver's recommendations into account in crafting Thompson's RFC assessment when he limited her to carrying items which weigh up to twenty pounds, and to standing or walking for no more than six hours in an 8-hour workday.(Tr. at 14). He also prohibited her from working in extreme heat, and limited her capacity for manual dexterity. (*See id*.). On this record, it is clear that the ALJ gave meaningful consideration to Dr. Culver's opinion, in its entirety, and subsequently chose to incorporate portions of that opinion into his decision, as he deemed appropriate. *See Wiltz v. Barnhart*, 484 F.Supp.2d 524, 532 (W.D. La. 2006) (citing *Greenspan*, 38 F.3d at 237 (an ALJ is entitled to determine the credibility of the examining physicians and medical experts and to weigh their opinions appropriately). On this record, the ALJ's decision is supported by substantial evidence.

### Dr. Robert Harper

In her final argument, Plaintiff alleges that the Appeals Council failed to consider "new and material evidence" from Dr. Robert Harper. (Plaintiff's Motion at 13-18). Thompson points to a report from Dr. Harper, dated January 5, 2015, in which he diagnosed Plaintiff as suffering from a major depressive disorder, and determined that it was likely that her depression had been aggravating her existing physical conditions. (Tr. at 34). Defendant, on the other hand, contends that Dr. Harper's opinion is not material, because it "pertains to a period post-dating the ALJ's decision." (Defendant's Response at 4).

All evidence, including newly submitted evidence, must be reviewed by the Appeals Council in making its decision. *Carry v. Heckler*, 750 F.2d 479, 486 (5th Cir. 1985).The Fifth Circuit has stated that the Appeals Council is not required to provide a detailed analysis, or otherwise explain

the weight given, to the new evidence. *Id.* at 335 n.1; *see also Jones v. Astrue*, 228 Fed. App'x 403, 406-07 (5th Cir. 2007) (per curiam). "When the Appeals Council denies review after considering evidence, the [Commissioner's] final decision necessarily includes the Appeals Council's conclusion that the ALJ's findings remained correct despite the new evidence." *Higginbotham v. Barnhart*, 405 F.3d 332, 336-37 (5th Cir. 2005) (internal quotations omitted). Under some circumstances, evidence that was unavailable, or that did not exist at the time of the hearing, may be cause for remand of an individual's claim. *See id.*, *Ripley*, 67 F.3d at 555. New evidence may be grounds for remand if it is material. *Castillo v. Barnhart*. 325 F.3d 550, 551 (5th Cir. 2003). The materiality inquiry requires a determination of whether the evidence "relates to the time period for which the disability benefits were denied, and whether there is a reasonable probability that the new evidence would change the outcome of the Commissioner's decision." *Id.* at 551-52 (citing *Ripley*, 67 F.3d at 555). The new evidence must "dilute the record to such an extent that the ALJ's decision becomes insufficiently supported." *Petticrew v. Colvin*, Civ. No. 4:13-CV-2119, 2014 WL 2880019, at *10 (S.D. Tex. 2014) (citing *Higginbotham v. Barnhart*, 163 F.App'x 279, 281-82 (5th Cir. 2006).

It is unclear from the record here whether the Appeals Council reviewed Dr. Harper's report, or summarily dismissed it, because it fell outside of the disability period. (*See* Tr. at 2). However, Dr. Harper's report, dated January 5, 2015, may well relate to the alleged disability period, April 13, 2012 (the alleged onset date) to October 17, 2014 (the date of the ALJ's decision), as it is dated only two to three months after the ALJ's decision. *See Joiner ex rel. D.J. v. Astrue*, No. 10-3375, 2011 WL 4853589, at *8 (E.D. La. Sept. 6, 2011) (records two to three months after ALJ decision are related to disability period) ; *cf Aycock v. Astrue*, No. 11-2088-ILRL-SS, 2012 WL 2154473, at *7 (E.D. La. May 21, 2012) (records submitted five months after ALJ's decision are not related to

disability period). Nevertheless, Plaintiff must show that there is a "reasonable probability that the new evidence would change the outcome of the Commissioner's decision." *Castillo*. 325 F.3d at 551. Here, however, there is nothing in record that points to a "reasonable probability" that a diagnosis of depression would have altered the ALJ's ultimate determination. Indeed, the "mere diagnosis of a mental impairment [] does not establish a claimant's disability claims." *Joiner*, 2011 WL 4853589, at *8. Thompson must show that she was so functionally impaired, because of her depression, that she was disabled from the alleged onset date, through the date of the ALJ's decision. *Id.*; *see also Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992). Plaintiff has made no such showing.[14] On this record, the Commissioner's decision is supported by substantial evidence.

In sum, the ALJ had no duty to develop the record regarding Plaintiff's alleged depression, because she did not allege depression as an impairment. The ALJ appropriately considered and incorporated the limitations found by Dr. Culver into the RFC assessment. Dr. Harper's report may have been material to Plaintiff's case, however, she has not shown that the evidence would have changed the disposition of her claim. For these reasons, it is recommended that Defendant's motion for summary judgment be granted, and that Plaintiff's motion be denied.

**Conclusion**

Based on the foregoing, it is **RECOMMENDED** that Commissioner Carolyn W. Colvin's Motion for Summary Judgment be **GRANTED**, and that Plaintiff's Motion for Summary Judgment be **DENIED**.

The Clerk of the Court shall send copies of the Memorandum and Recommendation to the

---

[14]Thompson also claims that the Appeals Council erred in failing to discuss any of the details in Dr. Harper's report. (Plaintiff's Motion at 16). However, the Appeals Council is not required to explain its reasons for rejecting the opinion from Dr. Harper, a non-treating physician. *Jones*, 228 Fed. App'x at 406-07 (Appeals Council is not required to explain weight given to new evidence submitted by examining physician).

respective parties, who will then have fourteen business days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c), General Order 02-13, S.D. Texas. Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas, 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

SIGNED at Houston, Texas, this 14th day of February, 2017.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**